OSCN Found Document:PRESCOTT v. OKLAHOMA CAPITOL PRESERVATION COMMISSION

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 PRESCOTT v. OKLAHOMA CAPITOL PRESERVATION COMMISSION
2015 OK 54
Case Number: 113332
Decided: 07/27/2015
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2015 OK 54, __ P.3d __

 

DR. BRUCE PRESCOTT, JAMES HUFF, and CHERYL FRANKLIN, Plaintiffs/Appellants,
DONALD CHABOT, Plaintiff,
v.
OKLAHOMA CAPITOL PRESERVATION COMMISSION, Defendant/Appellee.

ORDER DENYING REHEARING

¶1 The Oklahoma Capitol Preservation Commission (Commission) filed for rehearing from this Court's opinion filed on June 30, 2015. "Generally, rehearing is granted: (1) to correct an error or omission; (2) to address an unresolved jurisdictional issue; or (3) to clarify the opinion." Tomahawk Res., Inc. v. Craven, 2005 OK 82, supp. opinion on reh'g, ¶ 1 (internal citations omitted). We carefully consider the arguments of the Commission and find no merit warranting a grant of rehearing. The petition for rehearing of Appellee, Oklahoma Capitol Preservation Commission, is denied.

DONE BY ORDER OF THE SUPREME COURT IN CONFERENCE THIS 27th day of July 2015.

/S/CHIEF JUSTICE

Concur: Reif, C.J. (by separate writing), and Kauger, Watt, Winchester, Edmondson (by separate writing), Taylor (by separate writing with whom Gurich, J. joins), and Gurich (by separate writing), J.J.

Dissent: Combs, V.C.J. (by separate writing), and Colbert, J.

REIF, C.J., concurring specially to the denial of rehearing, 

¶1 For the most part, I concur to the denial of Appellee's petition for rehearing. Several reasons support such action.

¶2 First, the per curiam opinion contains no misstatement of fact or law. Furthermore, the per curiam opinion sets forth settled law that is dispositive of the issue presented and correctly applies such law in deciding the issue. More particularly, the per curiam opinion properly seeks the intent of Article 2, Section 5 in its text and the plain meaning of its language. Because this intrinsic analysis revealed no ambiguity, resort to extrinsic aids is improper and unnecessary.

¶3 As this Court has recently observed, "Absent an ambiguity, the intent of the framers and electorate is settled by the language of the provision itself and courts are not at liberty to search for its meaning beyond the provision." Fent v. Fallin, 2014 OK 105, ¶ 10, 345 P.3d 1113, 1116. The reason for this rule is simple: "Constitutional provisions are not made for parsing by lawyers, but for the instruction of the people and the representatives of government, so that they may read and understand their rights and duties." Id., ¶ 12, 345 P.3d at 1117.

¶4 Interestingly, the Legislature has likewise shown that it considers the language in Article 2, Section 5, to provide clear and unambiguous instruction for public officials. In 1981, the Legislature enacted 53 O.S. § 20.10, now 53 O.S.2011, § 1.18. This statute governs the expenditure of funds by the Oklahoma Historical Society and provides, in pertinent part, that "Funds shall not be applied, donated or used directly or indirectly for the use, benefit or support of any sect, church, denomination or system of religion, or for the use, benefit or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such." This statutory language is virtually identical to the text of Article 2, Section 5.

¶5 Finally, the narrow scope of the per curiam opinion is also consistent with the principle of judicial restraint. This principle dictates that if resolution of an issue effectively disposes of a case, a court should resolve the case on that basis without reaching any other issues that might be presented. Manning v. Upjohn Co., 862 F.2d 545, 547 (5th Cir. 1984).

¶6 Even though these considerations support the denial of rehearing, I would grant rehearing for the limited purpose of addressing the case of Meyer v. Oklahoma City, 1972 OK 46, 496 P.2d 789. Although clearly distinguishable from the case at hand, the Meyer case nonetheless provides helpful guidance in deciding whether a particular use of public property is for the benefit of a system of religion.

¶7 In Meyer, the taxpayer-plaintiff sought removal of a 50' Latin Cross from City property located at the Oklahoma City Fair Grounds. This Court affirmed the trial court's dismissal of the taxpayer's petition, observing: "The alleged commercial setting in which the cross now stands . . . obscures whatever suggestions may emanate from its silent form [and] vitiate[s] any use, benefit or support for any sect, church, denomination, system of religion or sectarian institution as such." Id., ¶ 11, 496 P.2d at 792-3.

¶8 This conclusion was grounded on two factors. First, this Court noted that "The cross is in a distinctly secular environment in the midst of persons in pursuit of distinctly secular entertainment." Id., 496 P.2d at 792. Secondly, this Court stressed that the cross did not "display, articulate or portray . . . any ideas that are alleged to pertain to any of the sectarian institutions or systems named in Article 2, § 5." Id.

¶9 The circumstances of the case at hand fail this test. First, the State Capitol, unlike the Oklahoma City Fair Grounds, is not a "commercial setting" nor "a distinctly secular environment" where persons are seeking "distinctively secular entertainment." The State Capitol is the Seat of State Government where the business of the people is debated and transacted.

¶10 Secondly, the Ten Commandments monument at issue in this case is nothing like the plain simple cross whose "symbolic message" was said to be "evanescent" or fleeting within the "commercial setting" of the fair grounds. The Ten Commandments monument in this case does explicitly "display" and "articulate" ideas that directly pertain to the Judeo-Christian system of religion.

¶11 The text of the Ten Commandments displayed on the monument is an edited version of the text of the Ten Commandments appearing in the King James Version of the Bible. Exodus 20:1-17 and Deuteronomy 5:6-21 (Authorized King James Version, Thomas Nelson Inc., 1999). While four of the commandments displayed on the monument do have counterparts in Oklahoma statutory law (proscriptions against killing, stealing, adultery and bearing false witness), these commandments are subsumed in a distinctly religious context that obscures whatever historical suggestions may emanate from them.

¶12 The text of the Ten Commandments displayed on the monument begins with the declaration "I AM the LORD thy GOD." This declaration is followed by four directions for the worship of God. In addition, the "historical" commandments are immediately preceded by a divine promise of long life for honoring one's parents. They are immediately followed by divinely ordained proscriptions against coveting things belonging to one's neighbor; a matter of conscience, not general social order. This dominance of the explicit religious message renders the monument "operative in an effective way" for the benefit of the of the Judeo-Christian system of religion. Meyer, ¶ 11, 496 P.2d at 792. As such, the monument's display on public property is properly enjoined. Id.

 

Edmondson, J., Concurring in denial of rehearing.

¶1 The Attorney General's historical argument is incorrect. The origin of Okla. Const. Art. 2 § 5 is with Thomas Jefferson and the example set by the People of Virginia and not the 1876 Blaine Amendment. See Connell v. Gray, 1912 OK 607, 127 P. 417, 420, where the Court discussed the connection between Art. 2 § 5 and a 1786 Virginia statute. See also R. L. Williams, The Constitution of Oklahoma and Enabling Act: Annotated with References to the Constitution, Statutes and Decisions, 1941, 2d ed., Art. 2 § 5, citing in the annotation the opinion Pfeiffer v. Board of Education of the City of Detroit, 118 Mich. 560, 77 N. W. 250, 251-252 (1898) and its explanation of an 1835 provision of that state's constitution which was in turn based upon the Virginia Constitution of 1830.

¶2 Further, unlike the one at hand a monument on public property communicating religious speech must also be capable of being reasonably construed to communicate a secular or nonreligious meaning as determined by its language and the setting it is placed. Compare McCreary County v. American Civil Liberties Union of Ky., 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (under contextual facts, Ten Commandments monument must be removed) with Van Orden v. Perry, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (under contextual facts, the Ten Commandments monument may stay). Cf. Meyer v. City of Oklahoma City, 1972 OK 45, 496 P.2d 789, 792 (no violation, considering the "silent" and "evanescent" (ephemeral, vanishing, transitory) nature of the fairgrounds cross).

¶3 Federal law is similar by allowing monuments with religious speech when the monument also portrays a secular meaning. The United States Court of Appeals for the Tenth Circuit has recognized that "The Ten Commandments have a secular significance that government may acknowledge . . . [and] we are unwilling to presume that the text of the Ten Commandments here could not be constitutionally integrated into a governmental display that highlights its secular significance." Green v. Haskell County Bard of Commissioners, 568 F.3d 784, 798 (10th Cir. 2009), cert. denied sub nom, Haskell County Bd. of Com'rs v. Green, 559 U.S. 970, 130 S.Ct. 1687, 176 L.Ed.2d 180 (2010).

¶4 We have no embracing historical and secular context here. This isolated monument stating religious principles with religious symbols, without any other statements of secular historical relevance, and no proximate presentation with a common secular theme, compels my conclusion that it violates the Oklahoma Constitution, Article 2 § 5.

¶5 I concur in the denial of the petition for rehearing.

Taylor, J., with whom Gurich, J. joins, concurring in the denial of the petition for rehearing:

¶1 I concur in the Court's order denying rehearing. I write separately to address issues raised in the Oklahoma Capitol Preservation Commission's petition for rehearing, filed by the Oklahoma Attorney General, and issues which were not directly confronted in this Court's opinion. The Commission urges that (1) this Court's jurisprudence permits items which benefit a system of religion to be placed on state property, (2) an analysis of the U.S. Constitution's Establishment Clause is relevant here and should be considered in this case, and (3) the Ten Commandments have historical, legal, and secular significance which override any religious benefit. Finally, the Commission has concern about the effect of this Court's decision on artworks housed in the State Capitol and on its grounds. I find nothing in the Commission's petition that convinces me that this Court should grant rehearing.

I. Oklahoma's Jurisprudence

¶2 As to the first of the Commission's arguments, this Court's jurisprudence is based first and foremost on the United States and Oklahoma constitutions. Okla. Const. art. I, § 1. The objective of construing the Oklahoma Constitution is to give effect to the framers' intent, as well as the people adopting it. Shaw v. Grumbine, 1929 OK 116, ¶ 30, 278 P. 311, 315 (quoting Lake Cnty. v. Rollins, 130 U.S. 662 (1889)). When a challenge is limited to the Oklahoma Constitution, we look first to its language, which if unambiguous, binds this Court; and we "are not at liberty to search for its meaning beyond the instrument." Id. ¶ 0, 278 P. at 311 (Syllabus by the Court No. 5); Gurney v. Ferguson, 1941 OK 397, ¶ 12, 122 P.2d 1002, 1004 (quoting Judd v. Bd. of Educ., 15 N.E.2d 576, 584 (N.Y. 1938) (We cannot "'circumvent [the constitution] because of private notions of justice or because of personal inclinations.'")).[1]

¶3 Article II, Section 5 of the Oklahoma Constitution, titled "Public money or property-Use for sectarian purposes," states:

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.

Because Article II, Section 5 is unambiguous as discussed in this Court's opinion, it was not error for this Court to rely solely on the Oklahoma Constitution as the basis for its decision. This provision unequivocally bars the state from allowing its property to be used for a religious benefit. Okla. Const. art. II, § 5. Article II, Section 5 is a clear limitation on state government spending and use of public property. It is a limitation on the state's reach into its citizens' private lives.

¶4 Although we need not search for extraneous support for our construction of Article II, Section 5's meaning, it is reassuring that this Court's construction is consistent with the framers' intent. Albert H. Ellis, the Second Vice President of the Constitutional Convention, explained that Article II, Section 5 was intended to be "one of the safest of our safeguards." Albert H. Ellis, A History of the Constitutional Convention of the State of Oklahoma 134 (1923). Mr. Ellis clarified that the Convention wrote Article II, Section 5 "knowing the history of the union of Church and State in Europe and in New England in Colonial days," and utilized the lessons learned in those situations. Id.

¶5 Mr. Ellis further explained that Article II, Section 5

not only guards the citizens right to be free from taxation for the support of the church, but protects the rights of all denominations, however few the number of their respective adherents, by with-holding any incentive that might prompt any ecclesiastical body to participate in political struggles and by reason of their numbers exert an undue influence and become beneficiaries at the expense of the public and a menace to weaker denominations and ultimately destructive of rel[i]gious liberty.

Id. It is also important to note that in his very complete discussion of Article II, Section 5, Mr. Ellis never mentions the Blaine Amendment.

¶6 The Oklahoma Constitutional Convention members started their proceedings with a prayer and the invocation of God's guidance and prefaced the Oklahoma Constitution by invoking God's guidance, all this showing that they were religious men who believed in God. Okla. Const. pmbl. However, they were also men who advocated for the toleration of all religious beliefs and complete separation of church and state by going further than the federal constitution. Closely following the preamble is Article I, Section 2 of the Oklahoma Constitution, which is entitled "Religious liberty-Polygamous or plural marriages." Section 2 secures "[p]erfect toleration of religious sentiment" and provides "no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship . . . ." Okla. Const. Art. I, § 2. Then only three sections later, the Constitutional Convention provided for public schools "free from sectarian control." Okla. Const. art. I, § 5. Seven sections later, they prohibited the use of state property, directly or indirectly, for the use, benefit, or support of religious group. Okla. Const. art. II, § 5. While the constitutional framers may have been men of faith, they recognized the necessity of a complete separation of church and state and sought to prevent the ills that would befall a state if they failed to provide for this complete separation in the Oklahoma Constitution.[2]

¶7 Applying Article II, Section 5, there is no question that the monument is on state property. The Appellee set it on the plaza directly north of the Oklahoma Capitol, which is part of the state capitol complex. The monument proclaims: " I AM the LORD thy God. Thou shalt have no other gods before me." See Appendix. The first part of the Ten Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding graven images, not using the Lord's name in vain, and observing the Sabbath Day." Stone v. Graham, 449 U.S. 39, 41 (1980). Many Christians and Jews believe these to be the direct words of God. ACLU of Ky. v. McCreary Cnty., 96 F.SupP.2d 679, 686 (E.D. Ky. 2000). The Ten Commandments are inseparable from religion, which has always been their primary purpose. The placement of the Ten Commandments monument on state property benefits the Judeo-Christian system of religion. The monument's placement on state property, proclaiming bedrock principles of the Judeo-Christian religious system, supports and benefits a system of religion in violation of Article II, Section 5; it must be removed.

¶8 The Commission's petition for rehearing, filed on behalf of the defendant, argues that this Court ignored the teachings of Meyer v. Oklahoma City, 1972 OK 45, 496 P.2d 789; Town of Pryor v. Williamson, 1959 OK 207, 347 P.2d 204; Murrow Indian Orphans Home v. Childers, 1946 OK 187, 171 P.2d 600; and Connell v. Gray, 1912 OK 607, 127 P. 417. However, none of these cases change Article II, Section 5's plain language or our construction of it.

¶9 This Court first addressed Section 5 in Connell v. Gray, 1912 OK 607, 127 P. 417. A college student was denied admission into a public university because she refused to pay a five-dollar term fee, half of which was put in trust to cover broken equipment and the other half going to, among other things, support of student-sectarian organizations like the Young Men's Christian Association (YMCA) and the Young Women's Christian Association (YWCA). Id. ¶ 1, 127 P. at 417. The Court held that it is impermissible for the legislature or a state-run organization to fund or require payment for the YMCA and the YWCA because they promulgate sectarian principles. Id. Just as Article II, Section 5 bans the state from forcing its citizens to fund a religious organization, it bars the state from subjecting its citizens to an assault of religion in which they do not adhere.

¶10 Although the Commission ignores this Court's decision in Gurney v. Furguson, 1941 OK 397, 122 P.2d 1002, the next in this line of cases, any survey of our jurisprudence on the issue before us requires its consideration. The Court ruled legislation unconstitutional which compelled school district officials to use public school buses to pick up and transport students who attended private or parochial schools. Id. ¶ 16, 122 P.2d at 1005. The Court concluded that the legislation authorized the use of public school funds to support sectarian schools. Id. ¶ 9, 122 P.2d at 1004. The Court ruled that any "legislative enactment which has the effect of authorizing or requiring the use of public property or the expenditure of public school funds in transporting pupils of a sectarian school to and from such school is violative of section 5, article 2 of the Constitution of Oklahoma." Id. ¶ 0, 122 P.2d at 1002 (Syllabus by the Court No. 3).

¶11 In Murrow Indian Orphans Home v. Childers, 1946 OK 187, 171 P.2d 600, this Court again analyzed Article II, Section 5. A Baptist-affiliated home for Native American orphans contracted with the state to provide care to children in exchange for payment. Id. ¶ 2, 171 P.2d at 601. The Court analyzed this issue by contrasting the public money paid to the organization affiliated with a sectarian institution against the consideration the state received by the organization housing Native American orphans. Id. ¶ 5, 171 P.2d at 603. The Court ruled that the state received sufficient consideration in exchange for the public money given to the organization and that the state was not using public money "for the use, benefit, or support of any sect, church, denomination, or system of religion." Id. ¶ 10, 171 P.2d at 603.

¶12 Childers has no application here. First, it is in a line of cases dealing with the expenditure of money to a sectarian organization. Second, there is not even a hint in this case that Oklahoma received any benefit for allowing the use of state property for this monument.

¶13 The Commission's reliance on State ex rel. Town of Pryor v. Williamson, 1959 OK 207, 347 P.2d 204, is misplaced. This Court was confronted with the issue of whether Article II, Section 5 barred the use of public funds for the construction of a non-sectarian, non-denominational chapel built at a state-owned orphans home. As the plaintiffs point out in their response to the petition to rehearing, Pryor is distinguishable because the chapel was eliminating a barrier to the exercise of religion.

¶14 In Meyer v. Oklahoma City, 1972 OK 45, 496 P.2d 789, a taxpayer challenged a fifty-foot high Latin cross, which had been erected at the state fairgrounds on public property but paid for with private money. The City of Oklahoma City paid to landscape the property and for lighting the cross. Id. ¶ 1, 496 P.2d at 790. The Court noted that Article II, Section 5 was "designed to prevent sectarian bodies from making raids upon the public treasury or from subjecting public property to unauthorized sectarian uses." Id. ¶ 6, 496 P.2d at 791. Central to the Court's analysis was the location of the cross, public property in a commercial setting--a "distinctly secular environment in the midst of persons in pursuit of distinctly secular entertainment." Id. ¶ 11, 496 P.2d at 792. Improperly applying the federal Establishment Clause's analysis to Article II, Section 5, and presuming the cross to be secular, the Court examined the cross in light of the location, ruling that it "cannot be said to display, articulate or portray, except in a most evanescent form, any ideas that are alleged to pertain to any of the sectarian institutions or systems named in Art. 2, § 5." Id.

¶15 I find the Meyer opinion to be lacking in value. First, it relied in part on Williamson, 1959 OK 207, 347 P.2d 204, which is discredited. Second, it is absent of analysis on and misstates the actual nature of the cross itself. Id. Third, by improperly applying the federal analysis to the Oklahoma Constitution, it created an unprecedented distinction in Article II, Section 5 by examining the nature of the public property (commercial, residential, or governmental). This distinction is nonexistent in and repugnant to the plain language of the constitutional provision. See id. Meyer is an anomaly in our jurisprudence, and no other case adopts the distinction of the property's nature. This Court should place no weight on its holding or analysis, and I would explicitly overrule it.[3]

¶16 None of the cases cited by the Commission or other cases where this Court has undertaken an analysis under Article II, Section 5 of the Oklahoma Constitution changes this Court's construction of the provision or holding that the Ten Commandments Monument on the state capitol complex violates Article II, Section 5 of the Oklahoma Constitution.

Blaine Amendments

¶17 Any reliance on Article II, Section 5 as a Blaine Amendment is misplaced. It is apparent from a comparison of the Oklahoma Constitution and the Blaine Amendment that Article II, Section 5 is not taken from the Blaine Amendment. The Blaine Amendment was proposed by Congressman James Blaine as an amendment to the federal constitution in the late 1870's in an attempt to boost his bid for the presidency. Steven K. Green, The Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38, 38 (1992) [hereinafter The Blaine Amendment]. At the time the Catholics wanted funding for their schools and, when denied, sought to ban the practice of daily readings of the protestant King James Verison of the Bible in schools. Id. at 41, 44.

¶18 The Blaine Amendment provides:

1. No State shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no religious test shall ever be required as qualification to any office or public trust under any State. No public property and no public revenue of, nor any loan of credit by or under the authority of, the United States, or any State, Territory, District, or municipal corporation, shall be appropriated to or made or used for the support of any school, educational or other institution under the control of any religious or anti-religious sect, organization, or denomination, or wherein the particular creed or tenets of any religious or anti-religious sect, organization, or denomination, shall be taught. And no such particular creed or tenets shall be read or taught in any school or institution supported in whole or in part by such revenue or loan of credit; and no such appropriation or loan of credit shall be made to any religious or anti-religious sect, organization, or denomination, or to promote its interests or tenets. This article shall not be construed to prohibit the reading of the Bible in any school or institution; and it shall not have the effect to impair rights of property already vested.

Sec. 2. Congress shall have power, by appropriate legislation, to provide for the prevention and punishment of violations of this article.

4 Cong. Rec. 5453 (1876).

¶19 The first sentence of the Blaine Amendment imposed the Establishment Clause's restrictions on states, as it was believed to only apply to the federal government at the time. The Blaine Amendment, at 50-51. Oklahoma's establishment clause restriction is found at Article I, Section 2 of the Oklahoma Constitution.

Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; and no religious test shall be required for the exercise of civil or political rights. . . .

Okla. Const. art. I, § 2.[4] Aside from imposing the federal Establishment Clause's restriction on states, the Blaine Amendment deals only with appropriations to benefit sectarian educational institutions. Oklahoma's provision dealing with appropriations for the benefit of sectarian schools is found at Article I, Section 5, which provides:

Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control . . . .

Unlike Article II, Section 5 of the Oklahoma Constitution, the Blaine Amendment does not, except for educational institutions, address the use of state property for the direct or indirect benefit of a religion or system of religion. Because the Blaine Amendment does not contain a general prohibition on the use of state property to benefit religion, Article II, Section 5 of the Oklahoma Constitution cannot be seen as a Blaine Amendment.

¶20 Article II, Section 5 makes no mention of schools, the Catholic Church, or the Blaine Amendment. Article II, Section 5 is a very simple, straight-forward statement of our founders that no public money or public property shall be used to support religious activity. Article II, Section 5's simple, very clear statement applies to everyone's religion equally. Our founders considered it good public policy.

II. Federal Establishment Clause

¶21 Although the issues are limited to the Oklahoma Constitution, I address the federal Establishment Clause only because the Commission argues that it is appropriate. Oklahoma's establishment clause compared with the federal Establishment Clause is far more specific in its limitations on state action. The federal Establishment Clause provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. It is evident from the difference in language used in Article II, Section 5 of Oklahoma Constitution and the federal Establishment Clause that they require different analyses.

¶22 While a violation of Article II, Section 5 of the Oklahoma Constitution may also violate the federal Establishment Clause, a state can always restrict its government's powers beyond the limits imposed on state action by the federal constitution. Alva State Bank & Trust Co. v. Dayton, 1988 OK 44, ¶ 7, 755 P.2d 635, 638; cf. Kelo v. City of New London, 545 U.S. 469, 489 (2005) ("We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power."). The Commission fails to explain and fails to support its position with any authority to the contrary.

¶23 Interestingly, and wrongly in my opinion, the defendant and the Legislature heavily relied on Van Orden v. Perry, 545 U.S. 677 (2005), for the constitutionality of and framework for erecting the monument in the present case. On June 27, 2005, the United States Supreme Court decided Van Orden, a plurality opinion,[5] and McCreary County, Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844 (2005), in which five Justices concurred in the Supreme Court's opinion. In my opinion, McCreary is analogous to the present case, whereas Van Orden is not. These two United States Supreme Court cases, like the case presently before us, involve placement of the Ten Commandments on government property.

¶24 There are several similarities between the monument on the Oklahoma state capitol complex and the Ten Commandments display in McCreary. Both originally stood segregated from any other historically significant monuments or displays. Both displays were initiated by the governing legislative body with a stated purpose of the display being of historical value but lacking any context to indicate an object beyond the religious nature of the text. Both were displayed only shortly before the legal attack seeking their removal and neither were long-installed displays. The monument on the Oklahoma state capitol complex is more religious in nature than the Ten Commandments display in McCreary because the Oklahoma monument has the additional language, "I AM the LORD thy God," which was not present in McCreary. 545 U.S. at 852, 855, 869. In contrast, the monument upheld as constitutional in Van Orden was in place forty years before it was legally challenged.

¶25 Concurring in judgment, Justice Breyer cast the deciding vote in Van Orden. While the deciding factor for the four concurring Justices was the monument's purpose, the deciding factor for Justice Breyer was the length of time the Texas monument had been in place before being challenged. Justice Breyer found Van Orden to be a borderline case. My reading of Justice Breyer's opinion concurring in result leads me to the conclusion that had the longevity factor been absent, as it is here and in McCreary, the Texas monument would not have passed constitutional scrutiny under the Establishment Clause. Further, while the Texas monument was identical in wording to the monument here, the less sectarian language on the Kentucky display that was unconstitutional shows that wording alone is not the determining factor.

¶26 If a federal analysis is needed in the future, this case is without question much more analogous to McCreary than Van Orden. Under a proper federal analysis, this monument would likely be held unconstitutional under the First Amendment.

III. Ten Commandments' Historical Significance

¶27 While agreeing that the Ten Commandments has historical significance, it is above all a religious symbol, and there is no basis to determine that the monument is primarily historical. Article II, Section 5 does not provide an exception for a religious monument that may be of some historical value. Article II, Section 5 is clear; legislative intent, the nature of the placement of a religious monument, its historical value, and whether a reasonable person would be offended are irrelevant; and any reliance on these factors in applying Article II, Section 5 is misplaced. The only question here is whether the monument benefits a system of religion. The Ten Commandments is an iconic symbol of the Christian religion and is inherently religious. Further, with the initial inscription being "I AM the LORD thy God," the monument needs no external references to know that it is primarily and foremostly religious. It is honored in the Judeo-Christian system of religion for its religious significance.

Twenty-five years ago in a case prompted by posting the Ten Commandments in Kentucky's public schools, this Court recognized that the Commandments "are undeniably a sacred text in the Jewish and Christian faiths" and held that their display in public classrooms violated the First Amendment's bar against establishment of religion. Stone found a predominantly religious purpose in the government's posting of the Commandments, given their prominence as "'an instrument of religion . . . .'"

McCreary, 545 U.S. at 859 (internal citations omitted). Simply, the monument's placement on state property supports and benefits a system of religion in violation of Article II, Section 5.

¶28 Nonetheless, I would note that the historical value of the Ten Commandments is a recognition of the role they played in religion.[6] The Ten Commandments are an iconic historic religious text from the Old Testament. However, the Ten Commandments are not mentioned in the Federalist Papers, the Declaration of Independence, the United States Constitution, or the Bill of Rights. Paul Finkelman, Ten Commandments Monuments and the First Amendment, 22 Okla. Bar J. 1749 (Aug. 13, 2005), available at http://www.okbar.org/members/BarJournal/archive2005/Augarchive05/obj7622ten.aspx. There was no mention of the Ten Commandments in the debates at 1787 Philadelphia Constitutional Convention. Id. The United States Supreme Court has never cited the Ten Commandments as a source of law. Id. One cannot ignore the paramount religious nature of the Ten Commandments.

VI. CONCLUSION

¶29 The plaintiffs brought their challenge to the Ten Commandments monument's placement on state property and the Capitol Preservation Commission's actions under Article II, Section 5 of the Oklahoma Constitution. The monument is an icon of the Judeo-Christian system of religion and is now situated on state property. Its placement on state property benefits the Judeo-Christian system of religion in violation of Article II, Section 5 of the Oklahoma Constitution. The questions of whether artworks housed in the State Capitol or other alarmist extraneous issues raised violate Article II, Section 5 are not before this Court. Article II, Section 5 applies to all religions equally by preventing the use of public funds or property for any religious benefit. A conservative, strict construction of the law leads to the conclusion that the Ten Commandments monument's location on state property is a clear violation of a straightforward, unambigious provision of the Oklahoma Constitution.

APPENDIX

Ten Commandments Monuments on the North Plaza of the Oklahoma State Capitol.

FOOTNOTES

[1] This axiom was expressed by Justice Scalia when he stated: "Words have meaning. And their meaning doesn't change. I mean, the notion that the Constitution should simply, by decree of the Court, mean something that it didn't mean when the people voted for it . . . ." Jennifer Senior, In Conversation: Antonin Scalia, New York (Oct. 6, 2013), http://nymag.com/news/features/antonin-scalia-2013-10/.

[2] This analysis is supported by the prominent Oklahoma historian and scholar, Dr. Bob L. Blackburn, Oklahoma Historical Society's executive director. Dr. Blackburn stated that even though the founders started their 1906 and 1907 proceedings with a prayer, they were against state support of any particular church. Dr. Blackburn noted that the Baptists "'would have been the biggest advocate of separation (of church and state)'" and that the Baptist church "'had been persecuted by mainline churches for well over a century.'" Barbara Hoberock, Oklahoma Supreme Court Not Likely to Change Position on Ten Commandments, ACLU Attorney Says, Tulsa World (July 3, 2015), http://www.tulsaworld.com/news/capitol_report/oklahoma-supreme-court-not-likely-to-change-position-on-ten/article_59f599e0-f7d3-563d-ad40-e17daaf12f49.html.

[3] It is noteworthy that the Meyer's cross was removed from the fairgrounds in 2003. The city manager of Oklahoma City at the time of its removal believed it to be unconstitutional and ordered its removal with the support of the city counsel. Steve Lackmeyer, Residents Protest Removal of Fair Cross, NewsOK (Feb. 28, 2003), http://newsok.com/residents-protest-removal-of-fair-cross/article/1917528. As evidence of its religious significance, the cross was placed on the property of two Oklahoma City churches. Jerry Pierce, Baptist Church, Church of Christ to Share Banned Okla. Cross, Baptist Press (June 10, 2003), http://www.bpnews.net/16059/baptist-church-church-of-christ-to-share-banned-okla-cross.-to-share-banned-okla-cross.

4 This wording is a direct quote of requirements to be provided for in the Oklahoma Constitution in order to be admitted as a State. Oklahoma Enabling Act of June 16, 1906, ch. 3335, 34 Stat. 267.

5 A plurality opinion is one in which no opinion receives a majority of the votes, but receives more votes than any other opinion, and the result receives five votes. Opinion, Black's Law Dictionary (10th ed. 2014).

6 The U.S. Supreme Court has the Ten Commandments displayed in their Courtroom in several locations, but their display is limited to representations of tablets with only roman numerals or, where written out, limited to a portion of the later secularly phrased commandments written in Hebrew and placed in the midst of 17 other historical lawgivers, religious and secular, also carrying representations of the law of their society or religion. McCreary Cnty., 545 U.S. at 874.

 

Gurich, J., concurring in the denial of rehearing: 

¶1 I fully join in the order denying rehearing in this case and in Justice Taylor's concurring opinion, but write separately to emphasize a few additional points. In his Petition for Rehearing, the Attorney General reargues issues previously presented and already fully considered by this Court. No grounds exist for rehearing this case. See Tomahawk Res., Inc. v. Craven, 2005 OK 82, ¶ 1, 130 P.3d 222, 225-26 (Supp. Op. on Rhg.).

¶2 Despite the fact that this Court decided the case solely on the basis of Art. II, § 5 of the Oklahoma Constitution,[1] on rehearing, the Attorney General continues to rely on Van Orden v. Perry, 545 U.S. 677 (2005), arguing that the U.S. Supreme Court upheld the constitutionality of a nearly identical Ten Commandments monument at the Texas State Capitol under the Establishment Clause of the First Amendment to the U.S. Constitution.[2] While the words and symbols on the monument at the Oklahoma State Capitol are the same as the Texas monument, the similarities between the two cases stop there. The Attorney General fails to mention that the Ten Commandments monument at the Texas State Capitol has been in place since 1961 and was donated to the state as "one of over a hundred largely identical monoliths, and of over a thousand paper replicas, distributed to state and local governments throughout the Nation over the course of several decades" by the Fraternal Order of Eagles.[3] Additionally, the Ten Commandments monument at the Texas State Capitol "sits in a large park containing 17 monuments and 21 historical markers . . . [in a] setting [that] does not readily lend itself to meditation or any other religious activity."[4] In contrast, the Ten Commandments monument at the Oklahoma State Capitol was not erected as part of the Fraternal Order of Eagles program of the 1950s and 1960s, but was installed in November of 2012 as a result of the passage of the Ten Commandments Monument Display Act by the Oklahoma Legislature and subsequent donations by private parties. The monument at the Oklahoma State Capitol sits alone on the north side of the Capitol, a location specifically selected as a "serene, reflective setting" and "one which supports the reflective purpose for the individual" in relation to the monument.[5] The monument at the Texas State Capitol went unchallenged for more than forty years; the monument at the Oklahoma State Capitol was challenged less than a year after it was installed.

¶3 And although the Attorney General asks us to rely on the Van Orden case, he does not mention McCreary County v. American Civil Liberties Union of Kentucky, 545 U.S. 844 (2005), which was decided the same day as Van Orden, wherein the U.S. Supreme Court struck down a Ten Commandments display at a Kentucky courthouse.[6] In McCreary, the Ten Commandments display at the Kentucky courthouse was first installed in the summer of 1999 and was challenged almost immediately in November of 1999. Distinguishing the Texas case from the Kentucky case, Justice Breyer wrote:

This case also differs from McCreary County, where the short (and stormy) history of the courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them. That history there indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document. And, in today's world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument [in Texas] has not.[7]

The same can be said in the case before us--almost immediately after the monument's installation at the Oklahoma State Capitol, the storm began. Not only was a lawsuit filed within months of the installation of the monument, but the Oklahoma Capitol Preservation Commission was forced to put a moratorium on monument requests because numerous groups either applied to have their own symbols erected or threatened litigation.[8]

¶4 Whether or not the Ten Commandments monument at the Oklahoma State Capitol passes constitutional muster under the Establishment Clause of the First Amendment to the U.S. Constitution is not before this Court. But a host of federal courts have struck down similar Ten Commandments displays under the Establishment Clause. In Books v. City of Elkhart, Indiana, 235 F.3d 292 (7th Cir. 2000), for example, the U.S. Court of Appeals for the Seventh Circuit held that a Ten Commandments monument at the municipal building in the City of Elkhart erected in 1958 by the Fraternal Order of Eagles was unconstitutional under the Establishment Clause. More recently, the U.S. Court of Appeals for the Tenth Circuit held that a Ten Commandments monument erected in 2005 at the Haskell County courthouse in Stigler, Oklahoma, was unconstitutional under the Establishment Clause. Green v. Haskell County Board of Com'rs, 568 F.3d 784 (10th Cir. 2009).[9]

¶5 It should also be noted that in this case the Legislature completely ignored the role the Oklahoma Capitol Preservation Commission is supposed to play in selecting works of art to be displayed at the Oklahoma State Capitol and the Governor's Mansion. See 74 O.S. § 4102. Section 4104 of Title 74 provides that the Commission shall "[e]stablish standards for the acquisition and display of works of art for public display in the Capitol and the Governor's Mansion and select such works. Such works of art shall be directly related to the history and culture of the State of Oklahoma." Additionally, section 115:10-1-2 of the Oklahoma Administrative Code provides: "Any foundation, group or individual interested in financing and donating an appropriate work of art to the State for use in the Capitol or the Governor's Mansion shall submit a written request for approval of a permanent display to the Commission."[10] At no point was a written request submitted to the Commission for approval, nor did the Commission affirmatively vote to authorize the placement of the Ten Commandments monument.[11] The Commission had no input with regard to the design of the monument,[12] and the only vote taken by the Commission with regard to the monument was its location on the Capitol grounds.[13]

¶6 Instead, the Legislature passed the Ten Commandments Monument Display Act, which was signed into law in May of 2009, and provides in part:

The State Capitol Preservation Commission or designee is hereby authorized to permit and arrange for the placement on the State Capitol grounds of a suitable monument displaying the Ten Commandments. The Ten Commandments monument shall use the same words used on the monument at issue in Van Orden v. Perry, that the United State Supreme Court ruled constitutional. This monument shall be designed, constructed, and placed on Capitol grounds by private entities at no expense to the State of Oklahoma. The State Capitol Preservation Commission or designee is authorized to assist private entities in selecting a location for the monument and arranging a suitable time for its placement.[14]

The Act was sponsored by State Representative Mike Ritze of Broken Arrow, who is an "[o]rdained Southern Baptist Deacon and Sunday School teacher."[15] Representative Ritze not only voted to approve the Act, but after the passage of the Act, Representative Ritze personally contracted with SI Memorials for the creation of the monument.[16] All work done on the monument itself was financed by Representative Ritze through private funds, and the monument specifically, and prominently, states that it was "presented to the people of Oklahoma by Dr. Mike and Connie Ritze and children Amity, Heidi and Jamey".[17]

¶7 As this Court held in its Per Curiam opinion, the plain language of Art. II, § 5 of the Oklahoma Constitution mandates the removal of the monument:

§ 5. Public money or property - Use for sectarian purposes.

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.[18]

Our Per Curiam opinion issued in this case, in my view, implicitly overruled Meyer v. Oklahoma City, 1972 OK 45, 496 P.2d 789, where this Court upheld the displaying of a fifty-foot cross at the state fairgrounds. I would explicitly overrule Meyer as that case was wrongly decided.[19] Regardless, Meyer is clearly distinguishable from this case. In Meyer, the Court said:

The cross is in a distinctly secular environment in the midst of persons in pursuit of distinctly secular entertainment. Notwithstanding the alleged sectarian conceptions of the individuals who sponsored the installation of this cross, it cannot be said to display, articulate or portray, except in a most evanescent form, any ideas that are alleged to pertain to any of the sectarian institutions or systems named in Art. 2, § 5. The alleged commercial setting in which the cross now stands and the commercial atmosphere that obscures whatever suggestions may emanate from its silent form, stultify its symbolism and vitiate any use, benefit or support for any sect, church, denomination, system of religion or sectarian institution as such.[20]

¶8 In this case, the Ten Commandments monument is permanently placed on the grounds of our State Capitol--the heart of our state government and "the civic home of every one of the State's citizens."[21] The fact that the "monument 'is installed on public property implies official recognition and reinforcement of its message. That implication is especially strong when the sign stands in front of the seat of government itself.'"[22] In fact, "the seat of government 'is so plainly under government ownership and control' that every display on its property is marked implicitly with governmental approval."[23]

¶9 And the monument itself is not silent, but displays the following message:

the Ten Commandments
I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbors.[24]

¶10 The legislative findings included in the Ten Commandments Display Act state that the "Ten Commandments are an important component of the foundation of the laws and legal system of the United State of America and of the State of Oklahoma."[25] But a self-serving declaration within the statute stating that the purpose of the monument is secular is of no meaning. Stone, 449 U.S. at 41.

¶11 "Attempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith."[26] The Ten Commandments are "plainly religious in nature," and are "undeniably a sacred text in the Jewish and Christian faiths."[27] "For many followers, the Commandments represent the literal word of God as spoken to Moses and repeated to his followers after descending from Mount Sinai."[28] The monument focuses "not only on subjects that are the legitimate concern of civil authorities, but also subjects that are beyond the ken of any government and that address directly the relationship of the individual human being and God."[29] "[T]he first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day."[30]

¶12 But even the "universally accepted prohibitions (as against murder, theft, and the like)" rest on "the sanction of the divinity proclaimed at the beginning of the text."[31] As the Court stated in McCreary County: "This is not to deny that the Commandments have had influence on civil or secular law; a major text of a majority religion is bound to be felt. The point is simply that the original text viewed in its entirety is unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction."[32] Stripping the Ten Commandments of their religious significance and characterizing them as secular and a component of the foundation of the laws of this State trivializes the sacred nature of the text and degrades those individuals who truly believe the Ten Commandments are a covenant between God and His people.

¶13 The legislative authorization eschewing a religious meaning also includes Section C of the Ten Commandments Display Act, which simply cannot be ignored:

In the event that the legality or the constitutionality of the Ten Commandments monument is challenged in a court of law, the Oklahoma Attorney General or Liberty Legal Institute is hereby authorized to prepare and present a legal defense of the monument.[33]

Not only is the Liberty Legal Institute named specifically in the Act, but an attorney for the Liberty Legal Institute entered an appearance on behalf of the Commission in the District Court shortly after the Attorney General filed his Answer in the case, and that same attorney also entered an appearance in this case on appeal on behalf of the Commission. The Liberty Legal Institute[34] is based out of Plano, Texas, with its stated mission to "defend and restore religious liberty across America--in our schools, for our churches, inside the military, and throughout the public arena."[35] The "Liberty Institute fights to restore religious liberty pursuant to the principles of America's founders--that religious freedom does not mean confining religious expression to church or home, but that true religious liberty consists of recognizing individuals' God-given right to follow their conscience and to live and act according to their faith in every area of life."[36] With regard to the Ten Commandments monuments, the Liberty Institute website states:

Liberty Institute is committed to enforcing the law that allows Ten Commandments displays in every state across the nation. But we can't do this alone. When you give your donation below, you help continue the work of enforcing the law that allows appropriate Ten Commandments monuments--like the Ten Commandments monument on the Oklahoma capitol grounds. So thank you for giving today![37]

On its website, under the tab "Pray", the Liberty Institute lists "prayer requests," including the case of "Prescott v. Oklahoma Capitol Preservation Commission": "Please pray for the Oklahoma Supreme Court justices as they consider the motion for rehearing."[38] Although the Legislature's stated secular purpose should generally receive deference, it is clear the secular purpose stated by the Legislature in the Ten Commandments Display Act is a "sham secular purpose," coming secondary to its obvious religious objective. McCreary, 545 U.S. at 864; See also Stone, 449 U.S. at 41.

¶14 The Act also states that "[t]he placement of this monument shall not be construed to mean that the State of Oklahoma favors any particular religion or denomination thereof over others."[39] This particular version of the Ten Commandments, which is identical to the versions donated by the Fraternal Order of Eagles in the 1950s and 1960s, was developed by "representatives of Judaism, Protestantism, and Catholicism" who purportedly "believed [it] to be a nonsectarian version of the Ten Commandments because it could not be identified with any one religious group."[40] But as Justice Stevens noted in the Van Orden case: "There are many distinctive versions of the Decalogue, ascribed to by different religions and even different denominations within a particular faith; to a pious and learned observer, these differences may be of enormous religious significance."[41] He continued: "[I]n the Jewish version of the Sixth Commandment God commands: 'You shall not murder'; whereas, the King James interpretation of the same command is: 'Thou shalt not kill.' The difference between the two versions is not merely semantic; rather, it is but one example of a deep theological dispute."[42] Displaying this particular version of the Ten Commandments on the grounds of the State Capitol not only violates the Oklahoma Constitution but also "invariably places the State at the center of a serious sectarian dispute[.]"[43]

¶15 The monument at the State Capitol also includes two Stars of David and the "Greek letters Chi and Rho as the familiar monogram of Christ,"[44] representing respectively Judaism and Christianity and confining its approval only to the Judeo-Christian faiths. The eagle clutching the American flag at the top of the monument then specifically links "these two religions, and civil government."[45] "When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual's decision about whether and how to worship."[46]

¶16 Finally, in spite of the court filings in this case, which conclude that Art. II, § 5, of the Oklahoma Constitution is a Blaine Amendment,[47] nothing in the recorded history of the Oklahoma Constitutional Convention, this Court's case law, or any other historical evidence supports this conclusion. In fact, all evidence is to the contrary. In 1875, Republican presidential candidate and Congressman James Blaine proposed an amendment to the U.S. Constitution, specifically targeting the funding of religious schools with public money.[48] "The Amendment came about at a time of heightened controversy over the religious character of American public education and the public funding of private religious schooling, primarily Catholic parochial schools."[49]

¶17 After failing to secure the Republican nomination for President, Congressman Blaine abandoned the cause and did not vote on the amendment or take part in any of the debates surrounding the amendment.[50] The amendment passed the House of Representatives, but failed to receive the necessary approval from the Senate.[51] Congressman Blaine's quick abandonment of the amendment has led some scholars to conclude that the "modern-day emphasis placed on the Blaine Amendment is misplaced,"[52] and that the attempted passage of the Blaine Amendment shows "our nation's continual willingness to use religious issues for political ends."[53]

¶18 Regardless, in 1889, a Republican-controlled Congress resurrected remnants of the failed Blaine Amendment in the Enabling Act of 1889, mandating that "four new states--Washington, Montana, North and South Dakota--include[] no-funding provisions in their constitutions" to become states.[54] From there, a no-funding provision was added to Oklahoma's Enabling Act in 1906, mandating "[t]hat provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control . . . ."[55]

¶19 The Oklahoma Constitutional Convention adopted the language of the Enabling Act verbatim into our Constitution in Article I, § 5 of the Oklahoma Constitution entitled "Public schools," which states: "Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all children of the state and free from sectarian control . . . ."[56] Although the adoption of such language by the Oklahoma Constitutional Convention could have been based on the unabashedly biased attitude toward Catholic parochial schools found in the failed Blaine Amendment, my review of the debates and proceedings of the Convention does not reflect such attitudes.[57] Nevertheless, what is clear is that the broader mandates of Art. II, § 5 cannot be found in the Enabling Act and concluding that Art. II, § 5 was the corollary to such language in the Enabling Act is error.[58]

¶20 As noted by R.L. Williams, a former Chief Justice of this Court and a delegate to the Oklahoma Constitutional Convention, Art. II, § 5 of the Oklahoma Constitution traces its origins to the Massachusetts Bill of Rights of 1780 passed ninety-five years before the Blaine Amendment, the Michigan Constitution of 1835 passed some forty years before the Blaine Amendment, the Missouri Constitution of 1820 passed more than fifty years before the Blaine Amendment, and the New Jersey Constitution of 1776 passed almost 100 years before the Blaine Amendment.[59]

¶21 In Connell v. Gray, 1912 OK 607, 127 P. 417, the Oklahoma Supreme Court, which included three justices who participated in the Oklahoma Constitutional Convention[60] and which was decided just five years after the ratification of our Constitution, similarly traced the origins of Art. II, § 5 to the Missouri Constitution and the Michigan Constitution, which were "prototype[s]" of "[t]he first legislative act passed toward the separation of church and state . . . by Virginia in 1786, entitled 'An act for establishing religious freedom,'" and "brought about by Thomas Jefferson."[61] The Virginia Act was later embodied in the Virginia Constitution of 1830, which predates the proposed Blaine Amendment by forty-five years.

¶22 Albert Ellis, the second Vice-President of the Oklahoma Constitutional Convention, wrote about Art. II, § 5 shortly after the ratification of the Oklahoma Constitution:

This section not only guards the citizens right to be free from taxation for the support of the church, but protects the rights of all denominations, however few the number of their respective adherents, by with-holding any incentive that might prompt any ecclesiastical body to participate in political struggles and by reason of their numbers exert an undue influence and become beneficiaries at the expense of the public and a menace to weaker denominations and ultimately destructive of religious liberty.[62]

¶23 More recent annotations also make no mention of the failed Blaine Amendment in their discussions of Art. II, § 5: "This provision relating to the church-state issue is much more explicit than that found in the U.S. Constitution."[63] A study of the Oklahoma Constitution by the League of Women Voters provides: "The Oklahoma Bill of Rights further details the separation of church and state by denying the use of state money or property for the benefit of any particular religious sect or denomination."[64]

¶24 A comparison of the text of the failed Blaine Amendment and the text of Art. II, § 5 also reveals that Art. II, § 5 is broader than the Blaine Amendment and does not limit its application only to schools. Art. II, § 5 states:

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.[65]

Whereas the failed Blaine Amendment provided:

No State shall make any law respecting an establishment of religion or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefore, nor any public lands devoted thereto, shall ever be under the control of any religious sect, nor shall any money so raised or lands so devoted be divided between religious sects or denominations.[66]

Characterizing Art. II, § 5 of the Oklahoma Constitution as a Blaine Amendment completely ignores the intent of the founders of the Oklahoma Constitution who purposely sought to ensure future generations of Oklahomans would be free to practice religious freedom without fear of governmental intervention.[67] 

¶25 Justice O'Connor wrote in the McCreary County case:

At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate: Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish. The well-known statement that '[w]e are a religious people,' has proved true. . . . Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?[68]

The constitutional guarantees of separation of church and state in many state constitutions "reflect their origin in specific disputes about the relationship between church and state . . . and represent considered constitutional judgments about contentious church-state issues."[69] Art. II, § 5 in our Constitution is no different. Mr. Ellis wrote: "The Convention, knowing the history of the union of Church and State in Europe and in New England in Colonial days, profited by the lessons of the past and made it impossible to appropriate or give to any church denomination or ecclesiastical servant or any religious institution, as such; the money or property of the public."[70]

¶26 Mr. Ellis went on to state that Art. II, § 5 "is one of the wisest provisions of our organic law. If there should ever be a demand by any ecclesiastical body that any part or portion of the public funds or any public property, be diverted to the use or benefit of any church or denomination or any of its servants, or for the support of any religious institution, as such; this section will be found to be one of the safest of our safeguards."[71]

¶27 This generation has the same obligation today as the Founders did in 1907 to protect the Constitution of our State, lest future generations review it in a casual way. As one member of the clergy wrote in 1923: "The People of this State should see to it well that [Art. II, § 5] in the bill of rights is never emasculated or nullified by any future convention, by one jot or title, but left intact as one of the imperishable provisions of the organic law protecting the people in their right against any encroachment by any ecclesiastical organization."[72]

FOOTNOTES

[1] Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).

[2] I first note that Van Orden was a plurality decision with seven separate opinions. No opinion garnered a majority of the Court. The splintered decisions from the U.S. Supreme Court "provide[] a justification for a state court to look to its state constitution for guidance. Certainly the Supreme Court, by its inconsistent decisions in establishment clause cases, has forfeited the deference often given to its rulings." G. Alan Tarr, Church and State in the States, 64 Wash. L. Rev. 73, at 109 (1989).

[3] Van Orden, 545 U.S. at 713 (Stevens, J., dissenting). The project began in Minnesota in 1943 and was inspired by a Minnesota juvenile court judge's experience with a juvenile offender who had never heard of the Ten Commandments. Id. The Minnesota chapter of the Fraternal Order of Eagles, of which the judge was a member, began distributing paper copies of the Ten Commandments to courthouses nationwide. Id. "When Cecil B. DeMille, who at that time was filming the movie The Ten Commandments, heard of the . . . endeavor, he teamed up with the Eagles to produce the type of granite monolith . . . displayed in front of the Texas Capitol and at courthouse squares, city halls, and public parks throughout the Nation." Id.

[4] Id. at 702 (Breyer, J., concurring in judgment).

[5] Record on Accelerated Appeal, Ex. 4. The monument sits approximately nine feet from the Capitol building on a slightly raised elevation and sits approximately 250-300 feet away from the Flag Plaza.

[6] Until the decisions in McCreary County and Van Orden, the only other U.S. Supreme Court case to address a Ten Commandments display was Stone v. Graham, 449 U.S. 39 (1980), where the Court struck down a Kentucky statute requiring the Ten Commandments to be displayed on the walls of public school classrooms in the state.

[7] Van Orden, 545 U.S. at 703 (Breyer, J., concurring in the judgment) (internal citations omitted) (emphasis added). Justice Breyer provided the decisive fifth vote in upholding the monument at the Texas State Capitol but voted with the majority in striking down the Kentucky display.

[8] One such request was from the Satanic Temple, who requested "a monument to Baphomet, which is a form of Satan, to be placed on the Capitol grounds." Record on Accelerated Appeal Ex. 4 (Deposition of Trait Thompson at 30). On December 19, 2013, the Commission minutes reflect Commission Chair, Trait Thompson, moved to put a moratorium on monument requests:

Earlier this year the ACLU brought a law suit against the Capitol Preservation Commission regarding the placement of the Ten Commandments Monument on the north lawn of the Capitol. Since that time the CPC has received numerous requests from individuals and groups seeking to place additional monuments on the grounds. At this time, I believe action by the CPC on any of these requests would be premature given that the lawsuit has yet to be decided. Therefore, I move the CPC place a moratorium on consideration of all monument requests for the State Capitol and its grounds until the lawsuit has been adjudicated.

Mr. Thompson's motion carried unanimously, and the moratorium remains in place.

[9] See also Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist., 919 F. SupP.2d 648 (W.D. Pa. 2013) (denying school's motion to dismiss because plaintiffs stated a facially plausible claim that a Ten Commandments monument in front of a high school that had been in place for decades violated the Establishment Clause); ACLU of Ohio Found., Inc. v. DeWeese, 633 F.3d 424 (6th Cir. 2011) (holding that poster hung in courtroom in 2006 including the Ten Commandments and stating that law is based upon morality violated the Establishment Clause and was not protected religious speech); Stanley v. Harris Cnty., Texas, 461 F.3d 504, 509-515 (5th Cir. 2006) (holding that a monument in place since 1956 in front of a courthouse prominently displaying an open bible in a glass display case, under the circumstances, violated the Establishment Clause), rehearing en banc, 485 F.3d 305 (2007) (appeal dismissed as moot on rehearing after the monument was removed to storage due to renovations at courthouse); Am. Civil Liberties Union of Ohio Found., Inc. v. Ashbrook, 375 F.3d 484 (6th Cir. 2004) (striking down a Ten Commandments display hung in a county courtroom in 2000); Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003) (striking down Ten Commandments monument placed in the rotunda of the Alabama State Judicial Building in 2001); Adland v. Russ, 307 F.3d 471 (6th Cir. 2002) (striking down Ten Commandments monument donated by Fraternal Order of Eagles in 1971, which had been removed in 1980 and put in storage, but which the Kentucky Legislature attempted to reinstall on capitol grounds in 2000); Am. Civil Liberties Union of Tenn. v. Hamilton, Cnty., 202 F.Supp.2d 757 (E.D. Tenn. 2002) (striking down Ten Commandments display put up in 2001 on the wall of county courthouse); Ind. Civil Liberties Union v. O'Bannon, 259 F.3d 766 (7th Cir. 2001) (enjoining Ten Commandments monument at the Indiana State Capitol that was planned to be erected in 2000); Kimbley v. Lawrence Cnty., Ind., 119 F.Supp.2d 856 (S.D. Ind. 2000) (enjoining Ten Commandments monument sought to be erected on lawn of county courthouse in 2000).

[10] Section 115:1-1-4(c)(3)(D) of the Administrative Code provides that the Architecture and Grounds Committee of the Commission is specifically responsible for "[a]pproval and placement of all monuments and sculptures surrounding the buildings[.]"

[11] Record on Accelerated Appeal, Ex. 4 (Deposition of Duane Mass at 67).

[12] Record on Accelerated Appeal, Ex. 4 (Deposition of Duane Mass at 49). Section 115:10-1-2(a) also provides that "[o]nly art and art objects of highest museum quality, consistent with legislative directives and approved by the Commission shall be permitted for permanent display in public areas of the Capitol." Duane Mass, Capitol Architect and member of the Commission, testified he "did not see the monument physically until it was installed." Record on Accelerated Appeal, Ex. 4 (Deposition of Duane Mass at 49).

[13] Record on Accelerated Appeal, Ex. 4 (Deposition of Duane Mass at 67). The location of the monument was approved by a vote of seven to four, but the record indicates the actual location of the monument was not even the location approved by the Commission, although both locations are on the north side of the Capitol. Record on Accelerated Appeal, Ex. 4; Record on Accelerate Appeal, Ex.12 at 7.

[14] 74 O.S. § 4110. The Act went into effect November 1, 2009.

[15] About Mike, Re-Elect Dr. Mike Ritze, http://www.mikeritze.com/aboutmike.html (last visited July 20, 2015).

[16] SI Memorials employees then traveled to Austin, Texas, and made rubbings of the Ten Commandments monument located at the Texas State Capitol. Work on the Monument began based on those rubbings. Record on Accelerated Appeal, Ex. 4.

[17] Art. V, § 24 of the Oklahoma Constitution provides: "A member of the Legislature, who has a personal or private interest in any measure or bill, proposed or pending before the Legislature, shall disclose the fact to the House of which he is a member, and shall not vote thereon." (emphasis added).

[18] Okla. Const. art. II, § 5.

[19] I see no reason for this Court to rely on the Lemon Test, as articulated in U.S. Supreme Court case law interpreting the Establishment Clause. Nowhere does Art. II, § 5 mention whether or not "a reasonable observer, aware of the history and context of the community in which the conduct occurs, would view the practice as communicating a message of government endorsement or disapproval." Green, 568 F.3d at 799.

The text of Art. II, § 5 of the Oklahoma Constitution plainly provides more protection to the citizens of this State than does the Establishment Clause of the U.S. Constitution, which provides: "Congress shall make no law respecting an establishment of religion. . . ."

[20] Meyer, 1972 OK 45, ¶ 11, 496 P.2d at 792-93. The Meyer Court said the cross was in a "state of disrepair," suggesting the cross had been at the fairgrounds a number of years before being challenged.

[21] Van Orden, 545 U.S. at 745 (Souter, J., dissenting) (emphasis added).

[22] Id. at 721 (Stevens, J., dissenting).

[23] Books, 235 F.3d at 306 (citing Am. Jewish Cong. v. City of Chicago, 827 F.2d 120, 128 (7th Cir. 1987)).

[24] After the installation of the monument, spelling errors were discovered on the monument. Shortly after the discovery of such mistakes, the misspelling of "Sabbeth" was corrected to "Sabbath," and the misspelling of "maidseruant" was corrected to "maidservant." Misspellings Mark Ten Commandments Monument At Oklahoma State Capitol, Newson6, http://www.newson6.com/story/20116587/misspellings-mark-ten-commandments-monument-at-oklahoma-state-capitol (last visited July 20, 2105).

The last sentence of this particular version of the Ten Commandments is repugnant to existing laws as women are no longer considered property and slavery was abolished before Oklahoma statehood.

[25] 2009 Okla. Sess. Laws Ch. 204. The legislative findings in Section A were not codified in 74 O.S. § 4110, nor would anyone observing the monument at the Capitol be alerted to the alleged link between the Ten Commandments and the laws of the State of Oklahoma.

[26] Van Orden, 545 U.S. at 717 (Stevens, J. dissenting) (emphasis added).

[27] Stone, 449 U.S. at 41.

[28] Van Orden, 545 U.S. at 716 (Stevens, J. dissenting).

[29] Books, 235 F.3d at 303.

[30] Stone, 449 U.S. at 42.

[31] McCreary County, 545 U.S. at 868.

[32] Id. at 869.

[33] 74 O.S. § 4110(C).

[34] Numerous courts have held that "[it] is not uncommon for courts to take judicial notice of factual information found on the world wide web." O'Toole v. Northrop Grunman Corp., 499 F.3d 1218, 1224-25 (10th Cir. 2007). See also Jeandron v. Bd. of Regents of the Univ. of Md., 510 F'Appx. 223, 227 (4th Cir. 2013); City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 655 n.1 (6th Cir. 2005). Additionally, 12 O.S. § 2202 provides that a court may take judicial notice of facts "whether requested or not" and when the facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

[35] About Liberty Institute, Liberty Institute, https://www.libertyinstitute.org/about (last visited July 20, 2015).

[36] Id.

[37] Help Continue the Work to Enforce the Law That Allows Ten Commandments Displays, Liberty Institute, https://www.libertyinstitute.org/pages/take-action/2014-okc-10-commandments-donation-page? (last visited July 20, 2015).

[38] Pray, Liberty Institute, https://www.libertyinstitute.org/take-action/pray (last visited July 20, 2015).

[39] 74 O.S. § 4110(D).

[40] Books, 235 F.3d at 294.

[41] Van Orden, 545 U.S. at 717-18 (Stevens, J., dissenting) (emphasis added).

[42] Id. at 718 n.16 (internal citation omitted).

[43] Id. at 718-19.

[44] Van Orden, 545 U.S. at 739 (Souter, J., dissenting).

[45] Books, 235 F.3d at 307.

[46] McCreary, 545 U.S. at 883 (O'Connor, concurring).

[47] See Brief of Amicus Curiae in Support of Defendant-Appellee by Professor Mark E. DeForrest. Professor DeForrest's interest in a case about a Ten Commandments monument at the Oklahoma State Capitol is curious. Professor DeForrest's scholarship on the Blaine Amendment focuses primarily on the effect of state Blaine Amendments on school voucher programs. See Mark Edward DeForrest, Locke v. Davey: The Connection Between the Federal Blaine Amendment and Article I, § 11 of the Washington State Constitution, 40 Tulsa L. Rev. 295 (2004); Mark Edward DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope and First Amendment Concerns, 26 Harv. J.L. & Pub. Pol'y 551 (2003).

[48] Steven K. Green, Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38, 38 (1992).

[49] Steven K. Green, The Insignificance of the Blaine Amendment, 2008 B.Y.U. L. Rev. 295, 295 (2008).

[50] Green, supra note 48, at 54.

[51] Green, supra note 49, at 296.

[52] Green, supra note 48, at 69.

[53] Id. On that same note, one local commentator observed that although one could make a good case that the monument on the Capitol grounds is unconstitutional, "a shrewd district judge facing an upcoming election would give the benefit of the doubt to the position supported by the substantial majority of Oklahomans." Andrew C. Spiropoulos, Right Thinking: Faith Grows Amid Opposition, The Journal Record, Sept. 24, 2014. The rule of law requires us to uphold the Constitution of this State regardless of what is popular or politically expedient.

[54] Steven K. Green, The Bible, the School, and the Constitution 232 (2012).

[55] Act of June 16, 1906, Pub L. No. 234, ch. 3335, 34 Stat. 267 (1906).

[56] Okla. Const. art. I, § 5.

[57] Unlike the Republican-controlled Congress, the Oklahoma Constitutional Convention delegates were overwhelmingly Democrat. See Albert H. Ellis, A History of the Constitutional Convention of the State of Oklahoma 49 (1923).

[58] In Locke v. Davey, 540 U.S. 712, 723 n.7 (2004), the U.S. Supreme Court, in discussing the Washington State Constitution, said:

The enabling Act of 1889, which authorized the drafting of the Washington Constitution, required the state constitution to include a provision 'for the establishment and maintenance of systems of public schools, which shall be . . . free from sectarian control.' This provision was included in Article IX, § 4, of the Washington Constitution ('All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence'), and is not at issue in this case. Neither Davey nor amici have established a credible connection between the Blaine Amendment and Article I, § 11, the relevant constitutional provision (internal citation omitted).

Article I, § 11 of the Washington Constitution is similar to Art. II, § 5 of the Oklahoma Constitution in that it provides in part that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment." Id. at 719 n.2.

[59] R.L. Williams, The Constitution and Enabling Act of the State of Oklahoma Annotated 10 (1st ed. 1912). This Court has relied upon Justice Williams' annotations for identifying the sources for various sections of the Oklahoma Constitution. City of Enid v. Pub. Emps. Relations Bd., 2006 OK 16, n.4, 133 P.3d 281, 291 n.4. Additional sources, as discussed herein, further substantiate the sources cited by Justice Williams in identifying the origins of Art. II, § 5.

[60] Justice R.L. Williams, Justice Samuel Hayes, and Justice Matthew Kane. Proceedings of the Constitutional Convention of the Proposed State of Okla. Held at Guthrie, Oklahoma Nov. 20, 1906--Nov. 16, 1907 at 26, 36, 70.

[61] Id. at 421. Thomas Jefferson first used the term "a wall of separation between Church & State" in an 1802 letter to the Danbury Baptist Association of Connecticut. Jefferson's Letter to the Danbury Baptists, Library of Congress, http://www.loc.gov/loc/lcib/9806/danpre.html (last visited July 20, 2015).

[62] Ellis, supra note 57, at 133-135.

[63] Danny M. Adkison and Lisa McNair Palmer, The Oklahoma State Constitution: A Reference Guide 30 (2001).

[64] League of Women Voters, Study of the State Constitution 15 (1966).

[65] Okla. Const. art. II, § 5.

[66] 4 Cong. Rec. 205 (1875). This is the version originally proposed by Congressman Blaine. The Amendment underwent significant changes while in the Senate. See 4 Cong. Rec. 5453 (1876).

[67] "Despite their claims to the contrary, opponents of the no-funding principle have generally failed to demonstrate a connection between the Blaine Amendment and the various provisions from legislative histories, convention records, or other historical sources." Green, supra note 49, at 298.

[68] McCreary County, 545 U.S. at 882 (O'Connor, J., concurring).

[69] See Tarr, supra note 2, at 95.

[70] Ellis, supra note 57, at 133-135.

[71] Id.

[72] Id. at 135 (quoting The Rev. J.M. Tressenriter).

 

 

COMBS, V.C.J., dissenting to denial of rehearing.

¶1 I dissent to the denial of rehearing in the above styled matter.[1] The Appellee requested a rehearing to clarify[2] the Per Curiam opinion in light of our previous decisions wherein we upheld the constitutionality of various acts under an Okla. Const. art. 2, § 5 challenge. The Per Curiam opinion's strict reading of Okla. Const. art. 2, § 5 ignores the context-based analysis we used in Meyer v. Oklahoma City, 1972 OK 45, 496 P.2d 789, and does not overrule that opinion. The Appellee's need for clarification is apparent.

¶2 The framers of the Oklahoma Constitution, although having strong views behind the creation of Okla. Const. art. 2, § 5 did not believe its provisions prohibited government acknowledgement of religion. Indeed, the first words of the Preamble to the Oklahoma Constitution state "[i]nvoking the guidance of Almighty God, in order to secure and perpetuate the blessing of liberty." This Court has previously determined, "[i]t is not the exposure to religious influence that is to be avoided; it is the adoption of sectarian principles or the monetary support of one or several or all sects that the state must not do." Murrow Indian Orphans Home v. Childers, 1946 OK 187, ¶7, 171 P.2d 600. I do not believe the intent or effect behind this Ten Commandments Monument ("Monument") was for the adoption of sectarian principles. My belief is based not only on our context-based analysis in Meyer[3] but also on the standard the district court and the parties agreed was proper to use in this analysis; one based on federal jurisprudence in Establishment Clause cases.

¶3 In its petition for rehearing, the Appellee asserts federal Establishment Clause precedent is relevant to this case.[4] I agree. The long and evolved federal jurisprudence concerning alleged unconstitutional monuments and displays is informative and persuasive in determining the meaning of "support" a "system of religion" in our own constitution.[5]

¶4 At the hearing on summary judgment the district court used an "objective standard" in finding the Monument did not violate Okla. Const. art. 2, § 5.[6] The attorney for the Appellant believed at the hearing that this was the proper standard; however, he appears to have interpreted the standard differently than the court.[7] This objective standard evaluates whether or not a reasonable observer, aware of the history and context of the community in which the conduct occurs, would view the government action as having a principle or primary effect of advancing or endorsing religion, or as here, government support of a system(s) of religion. See Bauchman for Bauchman v. West High School, 132 F.3d 542, 551-52, 555 (10th Cir. 1997). This reasonable observer is an informed reasonable observer whose knowledge of the context surrounding the alleged offending display goes outside just observing the display itself.[8] It is a legal standard akin to the reasonable person standard in tort law[9] and does not require a court to review endless testimony of opinion from actual observers.[10]

¶5 In religious symbols cases, context is the touchstone. Glassroth v. Moore, 335 F.3d 1282, 1284 (11th Cir. 2003). This is the case not only in federal Establishment Clause jurisprudence but also in our own jurisprudence. In Meyer v. Oklahoma City, 1972 OK 45, ¶11, 496 P.2d 789, a 50-foot Latin Cross which was placed on city property and whose lighting was provided by the city was challenged for violating Okla. Const. art. 2, § 5. This Court determined the cross did not violate Okla. Const. art. 2, § 5 because the commercial setting and atmosphere of the Fair Grounds obscured any suggestions that might emanate from the cross' silent form and further "stultify its symbolism and vitiate any use, benefit or support for any sect, church, denomination, system of religion or sectarian institution . . . ." Our holding in Meyer can best be interpreted as holding in Okla. Const. art. 2, § 5 cases the predominant context surrounding the challenged government action is dispositive. This is similar to the approach used in 2005 by Justice Breyer in determining the predominant context surrounding the Ten Commandments monument in Van Orden v. Perry, 545 U.S. 677 (2005).

¶6 In Van Orden, the constitutionality of a Ten Commandments monument on the Texas Capitol grounds was challenged as violating the Establishment Clause of the United States Constitution. Justice Breyer wrote the controlling opinion for the Court.[11] Justice Breyer believed that even though the Ten Commandments had an undeniable religious message, focusing on its text alone could not conclusively resolve the case. Id. at 701. He determined in order to resolve what the text of the message conveyed, the proper inquiry required the Court to "examine how the text is used" by considering the context of the display. Id. He found the text of the Ten Commandments can also be used in a secular way to convey a general moral message about proper social conduct or in a historical way to show a relation between its standards and the law. The latter he believed is why so many courthouses throughout the Nation, including the Supreme Court, displayed the tablets in some form. He determined the circumstances surrounding the monument's placement at the Texas Capitol and its physical setting suggested the State intended its secular message to predominate. Id.

¶7 Title 74 O.S. 2011, § 4110 (HB 1330) proclaimed the Monument was not meant to be construed to favor any particular religion or denomination over others and it was essentially just another monument on the Capitol grounds.[12] In federal jurisprudence, the courts have deferred to the professed government purpose unless the secular purpose is a sham or secondary to a religious purpose.[13] Where a "plausible secular purpose" has been demonstrated, the courts will give deference to the government's motives.[14] The record is also silent as to any contravening sectarian purpose behind the Monument's placement.

¶8 The Appellants expressly stated they were not challenging the constitutionality of HB 1330. The Appellants are challenging the actions of the Appellee. Under federal jurisprudence, "whether the government has endorsed a particular religious display depends in large part on the display's particular physical setting." O'Connor v. Washburn University, 416 F.3d 1216, 1228 (10th Cir. 2005) (citing Lynch v. Donnelly, 465 U.S. 668, 671, 681-82, 685 (1984)). The Appellants asserted the Appellee's placement and positioning of the Monument puts it in a prominent position leading one to conclude it represents State support of a system(s) of religion. The question being, regardless of purpose or intent, was the placement and positioning of the Monument done in such a way that an informed reasonable observer would conclude it represents State support of a system(s) of religion? It appears from the record that the Monument was placed in possibly the most inconvenient and low-trafficked part of the Capitol grounds imaginable. Its placement on the northeast side of the Capitol Building makes it impossible to view from the main parking lot or any entrance to the building. The main parking lot and main entrance are on the south side of the Capitol Building with the other two working entrances being on the east and west sides. Because of this placement, a person inside the Capitol Building should only be able to see the Monument through some of the windows on the east side of the north wing and the north side of the east wing. Next to the Monument is a short stairway that leads to the north entrance of the Capitol and is the only entrance on that side of the building. However, this nearby north entrance has been closed for many years. The Monument sits at the top and to the east of the stairway. The closest route from the Capitol Building to the Monument requires one to leave the east or west side doors and walk a quarter of the way around the large building. Nor does its placement provide accommodation for meditation or other religious activity. I do not believe an informed reasonable observer seeing the Monument would find that its placement or positioning rises to the level of being sacred or is in any way more unique than the placement of any of the many other monuments on the Capitol grounds including the few that reside on the north side.

¶9 Nor do I believe that the Monument's content leads an informed reasonable observer to conclude it supports a system(s) of religion as asserted by the Appellants. The message on the Monument's face is not the full story. What a reasonable observer is aware of "is not limited to the 'information gleaned simply from viewing the challenged display.'" O'Connor v. Washburn University, 416 F.3d 1216, 1228 (citing Wells v. City & County of Denver, 257 F.3d 1132, 1142-43 (10th Cir. 2001)). I agree with the reasoning of Justice Breyer in Van Orden, who found that the text of the Ten Commandments was religious "invoking, indeed emphasizing, the Deity," yet he determined that fact alone was not dispositive. Van Orden v. Perry, 545 U.S. 677, 700-701 (Breyer, J., concurring). One must review the surrounding context. Here, the surrounding context also takes into account the plausible secular historical/legal purpose of the Legislature. In addition, the Monument includes an inscription showing it was privately donated. Such message further distances the State from the Monument in the mind of a reasonable observer. See Card v. City of Everett, 520 F.3d 1009, 1020 (9th Cir. 2008).

¶10 The Appellants also asserted the fact that the Monument was not made part of a larger display or coordinated series of monuments only adds to the effect that the State was adopting sectarian principles. I disagree. I do not find the spacing or density of monuments is indicative here of an adoption of sectarian principles. The monuments spread throughout the Oklahoma Capitol Complex appear not to be part of any particular spacing scheme or planned density. As the court in Card v. City of Everett, 520 F.3d 1009, 1020 (9th Cir. 2008) determined in its context analysis, there is no "quota system for monuments or a requirement for a particular density of monuments in a given area." It should be noted that in Meyer there was only one monument and it was found to be constitutional by this Court.

¶11 Although initially raised on appeal in the Appellee's answer brief, on rehearing the parties did not brief the issue of whether Okla. Const. art. 2, § 5 is a state Blaine Amendment; however, other Justices of this Court have addressed this issue. The Blaine Amendment was a failed 1870's proposed amendment to the United States Constitution to bar aid to sectarian institutions. Mitchell v. Helms, 530 U.S. 793, 828 (2000). The proposed amendment "arose at a time of pervasive hostility to the Catholic Church. and it was an open secret that 'sectarian' was code for 'Catholic'. Mitchell, 530 U.S. at 828. This amendment would have applied almost exclusively to Catholic parochial schools. Id. at 829. The Appellee had previously cited a 2003 law review article written by Mark E. DeForrest, for the purpose of demonstrating, after the Blaine Amendment's failure, states adopted similar provisions in their own constitutions.[15]

¶12 The parties have not cited any decision of this Court where we have referred to Okla. Const. art. 2, § 5 as an Oklahoma version of the Blaine Amendment or construed it so narrowly to only apply to sectarian institutions, or in other words, parochial schools. On this issue I would agree with the other Justices of this Court that Okla. Const. art. 2, § 5 is not Oklahoma's version of a Blaine Amendment. The breadth and scope of Okla. Const. art. 2, § 5 differ significantly from the failed Blaine Amendment.

¶13 In conclusion, I disagree with the Per Curiam opinion's overly narrow interpretation of the language in Okla. Const. art. 2, § 5. Since statehood this Court has interpreted our Constitution. I do not adopt the strict approach taken by other members of this Court in determining the meaning behind "support" of a "system of religion". Additionally, I would limit findings to the record before the court on issues presented by the parties. I find the appropriate analysis of Okla. Const. art. 2 § 5 is a context-based analysis like that used by this Court in Meyer and found in federal jurisprudence. We should not lightly attribute unconstitutional motives to the government where we can discern a plausible secular purpose. I am of the opinion the facts of this case have more similarities to Van Orden than not. However, as Justice Breyer believed in Van Orden, I believe this case is a borderline case. A slight change in its facts could have tipped my view concerning the effect the Monument conveyed upon a reasonable observer. Today our State is composed of many different religious beliefs and many persons of no religion. Wisdom, prudence and caution should be at the forefront when considering the placement of displays on government property. However, for the foregoing reasons, I dissent to the denial of the petition for rehearing.

FOOTNOTES

[1] I would also restyle the case and set out Donald Chabot as a plaintiff only and not as an appellant. According to the Brief of Plaintiffs/Appellants, filed March 16, 2015, Mr. Chabot died prior to the district court's ruling and is not an appellant in this case.

[2] Tomahawk Resources, Inc. v. Craven, 2005 OK 82, supp. op. ¶1, 130 P.3d 222.

Generally, rehearing is granted: (1) to correct an error or omission, see Sooner Federal Savings and Loan Ass'n v. Mobley, 1981 OK 124, supp. op. ¶¶ 1-11, 645 P.2d 1000, 1003-04; Davis v. Fieker, 1997 OK 156, supp. op. ¶ 1, 952 P.2d 505, 516-17; Sharp v. Tulsa, 1994 OK 104, supp. op. ¶ 3, 890 P.2d 836, 846; I.C. Gas Amcana, Inc. v. Hood, 1992 OK 119, supp. op. ¶2, 855 P.2d 597, 601; (2) to address an unresolved jurisdictional issue, see Sholer v. State ex rel. Dept. of Pub. Safety, 1995 OK 152, supp. op. ¶ 3, 945 P.2d 469, 478; or (3) to clarify the opinion, see City of Oklahoma City v. State ex rel. Okla. Dept. of Labor, 1995 OK 107, supp. op. ¶ 1, 918 P.2d 26, 31. Rehearing is not for rearguing a question which has been previously presented and fully considered by this Court. See Draper v. State, 1980 OK 117, supp. op. ¶¶ 1-2, 621 P.2d 1142, 1147. Likewise, it is not for presenting points which the losing party overlooked, misapprehended, or failed to fully address.

[3] In Meyer v. Oklahoma City, 1972 OK 45, 496 P.2d 789, this Court upheld the constitutionality of a 50-foot cross on city property which was lit by electricity funded by the city and whose facts are arguably more offensive to the provisions of Okla. Const. art. 2, §5, than the facts presented in this case

[4] The Establishment Clause of the United States Constitution (U.S. Const. amend. I), provides in pertinent part: "[c]ongress shall make no law respecting an establishment of religion."

[5] The Plaintiffs/Appellants allege the Monument supports a system of religion in violation of Okla. Const. art. 2, § 5. This section provides:

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.

[6] ROA, Doc. 15, p. 7-8 (Transcript of Proceedings held on September 19, 2014). The transcript provides that when the district judge asked plaintiffs' attorney, Mr. Henderson, whether the plaintiff s' position is the court should use an objective standard, Mr. Henderson replied, "I believe so, Your Honor, but I think it's also an objective standard that's informed by the observations of those people directly observing the monument."

[7] Id.

[8] What a reasonable observer is aware of "is not limited to the 'information gleaned simply from viewing the challenged display.'" O'Connor v. Washburn University, 416 F.3d 1216, 1228 (10th Cir. 2005) (quoting Wells v. City & County of Denver, 257 F.3d 1132, 1142-43 (10th Cir. 2001)).

[9] Gaylor v. U.S., 74 F.3d 214, 217 (10th Cir. 1996).

[10] In Gaylor, the Court found the application of the reasonable observer standard explained why it was rejecting the appellants' insistence on further fact-finding at the trial court level. It determined:

We need not engage in such empirical investigation because 'we do not ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think [the State] endorses religion. [T]he endorsement inquiry is not about the perceptions of particular individuals or saving isolated non-adherents from the discomfort of viewing symbols of faith to which they do not subscribe.' It is instead an objective inquiry that this court is fully equipped to conduct with the facts at hand.

Gaylor, 74 F.3d at 217. (Internal citations omitted).

[11] In Green v. Haskell County Board of Comm'rs, 568 F.3d 784, 807 n.17 (10th Cir. 2009), the Court noted:

Given that Van Orden was decided by a plurality, the separate opinion of Justice Breyer, who supplied the "decisive fifth vote," Heideman v. S. Salt Lake City, 348 F.3d 1182, 1198 (10th Cir.2003), is controlling under the rule of Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.").

[12] Subsection D of Section 2 of House Bill 1330 provided:

The placement of this monument shall not be construed to mean the State of Oklahoma favors any particular religion or denomination thereof over others, but rather will be placed on the Capitol grounds where there are numerous other monuments.

2009 Okla. Sess. Laws ch. 204, §2.

[13] Weinbaum v. City of Los Cruces, N.M., 541 F.3d 1017, 1031 (10th Cir. 2008).

[14] Id. (citing Bauchman for Bauchman v. West High School, 132 F.3d 542, 554 (10th Cir. 1997)).

[15] Mark E. DeForrest, An Overview and Evaluation of State Blaine Amendments Origins, Scope, And First Amendment Concerns, 26 Harv. J.L. & Pub. Pol'y 551 (2003). Mr. DeForrest also presented an Amicus Curiae Brief to both this Court and the district court in the present case discussing the Blaine Amendment and the alleged state adoption of such provisions.

 

 

DR. BRUCE PRESCOTT, JAMES HUFF, DONALD CHABOT, and CHERYL FRANKLIN, Plaintiffs-Appellants, v.
OKLAHOMA CAPITOL PRESERVATION COMMISSION, Defendant-Appellee.

ON APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY;
STATE OF OKLAHOMA;
HONORABLE THOMAS E. PRINCE

¶0 Oklahoma citizens challenged the placement of a Ten Commandments Monument on the grounds of the Oklahoma State Capitol under Article 2, Section 5 of the Oklahoma Constitution. The trial court entered summary judgment for the Defendant and denied injunctive relief. Citizens appealed, and we retained the case. We hold that the Ten Commandments Monument violates Article 2, Section 5 of the Oklahoma Constitution, is enjoined, and shall be removed.

DISTRICT COURT'S JUDGMENT REVERSED; MATTER REMANDED
FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION

Ryan Kiesel, Brady Henderson, ACLU of Oklahoma Foundation, Oklahoma City, Oklahoma, Attorney for Plaintiffs-Appellants
E. Scott Pruitt, Patrick Wyrick, Cara N. Rodriguez, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma, Attorney for Defendant-Appellee
Hiram Sasser, Liberty Institute, Plano, Texas, Attorney for Defendant-Appellee
Paul D. Clement, George W. Hicks, Jr., Taylor A.R. Meehan, Bancroft PLLC, Washington, DC, Attorneys for Amicus Curiae Mark E. DeForrest
Mark D. Spencer, McAfee & Taft, Oklahoma City, Oklahoma, Attorney for Amicus Curiae Mark E. DeForrest

PER CURIAM 

¶1 Oklahoma citizens Bruce Prescott, James Huff, and Cheryl Franklin (complainants) seek removal of a Ten Commandments monument from the Oklahoma Capitol grounds. The monument was a gift from another Oklahoma citizen and was placed on the Capitol grounds pursuant to a Legislative act that was signed by the Governor. While conceding that no public funds were expended to acquire the monument, complainants nonetheless maintain its placement on the Capitol grounds constitutes the use of public property for the benefit of a system of religion. Such governmental action is forbidden by Article 2, Section 5 of the Oklahoma Constitution.

¶2 The trial court ruled that the monument did not violate Article 2, Section 5 and entered a summary judgment denying complainants' request for an injunction. This Court reviews de novo the constitutional issue and the legal question resolved by the summary judgment. Sw. Bell Tel. Co. v. Okla. State Bd. of Equalization, 2009 OK 72, ¶ 10, 231 P.3d 638, 641. Upon de novo review, the trial court's ruling is reversed.

¶3 In deciding whether the State's display of the monument in question violates Article 2, Section 5, the intent of this provision must be ascertained. Draper v. State, 1980 OK 117, ¶ 8, 621 P.2d 1142, 1145. Such intent is first sought in the text of the provision. Id. Words of a constitutional provision must be given their plain, natural and ordinary meaning. Lepak v. McClain, 1992 OK 166, ¶ 7, 844 P.2d 852, 854.

¶4 The text of Article 2, Section 5 states:

§ 5. Public money or property - Use for sectarian purposes.

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.

The plain intent of Article 2, Section 5 is to ban State Government, its officials, and its subdivisions from using public money or property for the benefit of any religious purpose. Use of the words "no," "ever," and "any" reflects the broad and expansive reach of the ban. See Coffee v. Henry, 2010 OK 4, ¶ 3, 240 P.3d 1056, 1057.

¶5 To reinforce the broad, expansive effect of Article 2, Section 5, the framers specifically banned any uses "indirectly" benefitting religion. As this Court has previously observed, the word "indirectly" signifies the doing, by an obscure, circuitous method, something which is prohibited from being done directly, and includes all methods of doing the thing prohibited, except the direct means. Haynes v. Caporal, 1977 OK 166, ¶ 7, 571 P.2d 430, 433. Prohibiting uses of public property that "indirectly" benefit a system of religion was clearly done to protect the ban from circumvention based upon mere form and technical distinction.

¶6 In authorizing its placement, the Legislature apparently believed that there would be no legal impediment to placing the monument on the Capitol grounds so long as (1) the text was the same as the text displayed on the Ten Commandments monument on the grounds of the Texas State Capitol, and (2) a non-religious historic purpose was given for the placement of the monument. To be sure, the United States Supreme Court case of Van Orden v. Perry, 545 U.S. 677 (2005), ruled that the Texas Ten Commandments monument did not violate the Establishment Clause in the First Amendment to the United States Constitution. However, the issue in the case at hand is whether the Oklahoma Ten Commandments monument violates the Oklahoma Constitution, not whether it violates the Establishment Clause. Our opinion rests solely on the Oklahoma Constitution with no regard for federal jurisprudence. See Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). As concerns the "historic purpose" justification, the Ten Commandments are obviously religious in nature and are an integral part of the Jewish and Christian faiths.

¶7 Because the monument at issue operates for the use, benefit or support of a sect or system of religion, it violates Article 2, Section 5 of the Oklahoma Constitution and is enjoined and shall be removed.

DISTRICT COURT'S JUDGMENT REVERSED; MATTER REMANDED FOR 
FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION

¶8 Reif, C.J., Kauger, Watt, Winchester, Edmondson, Taylor, Gurich, JJ., concur.

¶9 Combs, V.C.J., Colbert, J., dissent.






 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 44, 755 P.2d 635, 59 OBJ 1159, Alva State Bank and Trust Co. v. Dayton
Discussed
 1941 OK 397, 122 P.2d 1002, 190 Okla. 254, GURNEY v. FERGUSON
Discussed at Length
 1992 OK 119, 855 P.2d 597, 63 OBJ 2119, I.C. Gas Amcana, Inc. v. J.R. Hood
Discussed
 1992 OK 166, 844 P.2d 852, 63 OBJ 3757, Lepak v. McClain
Discussed
 1994 OK 104, 890 P.2d 836, 65 OBJ 3055, Sharp v. Tulsa County Election Bd.
Discussed
 1946 OK 187, 171 P.2d 600, 197 Okla. 249, MURROW INDIAN ORPHANS HOME v. CHILDERS
Discussed at Length
 1959 OK 207, 347 P.2d 204, STATE v. WILLIAMSON
Discussed at Length
 1995 OK 107, 918 P.2d 26, 66 OBJ 3184, City of Oklahoma City v. State ex rel. Oklahoma Dept. of Labor
Discussed
 1972 OK 45, 496 P.2d 789, MEYER v. OKLAHOMA CITY
Discussed at Length
 2005 OK 82, 130 P.3d 222, TOMAHAWK RESOURCES, INC. v. CRAVEN
Discussed at Length
 2006 OK 16, 133 P.3d 281, CITY OF ENID v. PUBLIC EMPLOYEES RELATIONS BOARD
Discussed
 1929 OK 116, 278 P. 311, 137 Okla. 95, SHAW v. GRUMBINE
Discussed
 2009 OK 72, 231 P.3d 638, SOUTHWESTERN BELL TELEPHONE CO. v. OKLA. STATE BD. OF EQUALIZATION
Discussed
 2010 OK 4, 240 P.3d 1056, COFFEE v. HENRY
Discussed
 2014 OK 105, 345 P.3d 1113, FENT v. FALLIN
Cited
 1977 OK 166, 571 P.2d 430, HAYNES v. CAPORAL
Discussed
 1980 OK 117, 621 P.2d 1142, Draper v. State
Discussed at Length
 1981 OK 124, 645 P.2d 1000, Sooner Federal Sav. and Loan Ass'n v. Mobley
Discussed
 1997 OK 156, 952 P.2d 505, 69 OBJ 34, DAVIS v. FIEKER
Discussed
 1995 OK 152, 945 P.2d 469, 68 OBJ 2330, Sholer v. State ex rel. Department of Public Safety
Discussed
 1912 OK 607, 127 P. 417, 33 Okla. 591, CONNELL v. GRAY
Discussed at Length
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2202, Judicial Notice of Adjudicative Facts
Cited
Title 53. Oklahoma Historical Societies and Associations
 Cite
Name
Level

 53 O.S. 20.10, Renumbered as 53 O.S. § 1.18 by Laws 1988, HB 1937, c. 217, § 15, emerg. eff. June 21, 1988
Cited
 53 O.S. 1.18, Dispensation of Funds - Limitations
Cited
Title 74. State Government
 Cite
Name
Level

 74 O.S. 4102, Creation - Responsibilities
Cited
 74 O.S. 4110, Ten Commandments Monument Display Act
Discussed at Length